FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 0 1 2009

JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

**UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF ARKANSAS**
Western Division

**HERB LAIR**

PLAINTIFF

vs.      Case No. 4:09-W-405 JMM -

**PAUL G. ALLEN;
ELOISE SCHMITZ; AND
NEIL SMIT**

**DEFENDANTS**

## CLASS ACTION COMPLAINT

Plaintiff has alleged the following based upon the investigation of plaintiffs' counsel, which included a review of the United States Securities Exchange Commission ("SEC") filings of Charter Communications, Inc. ("Charter"), as well as regulatory filings and reports, securities analysts' reports and advisories about Charter, press releases and other public statements issued by Charter and the Defendants, Paul W. Allen ("Allen"), Eloise Schmitz ("Schmitz"), and Neil Smit ("Smit"), and media reports about Charter, and plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein after a reasonable opportunity for discovery.

This case assigned to District Judge Moody
and to Magistrate Judge JONTR

## INTRODUCTION

1.     This is a securities class action on behalf of all persons who purchased or otherwise acquired the stock of Charter Communications, Inc. ("Charter") between October 23, 2006, and February 12, 2009, inclusive (the "Class Period") against certain of the officers and/or directors of Charter for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.     Charter operates broadband communications businesses in the United States, with approximately 5.5 million customers during the year ending

1

December 31, 2008. Charter offers traditional cable video programming (basic and digital video), high-speed Internet access, and telephone service, as well as advanced broadband services such as high definition television Charter OnDemand (OnDemand) and digital video recorder (DVR) service). As of December 31, 2008, the Company served approximately 5 million video customers, of which approximately 3.1 million were digital video customers. It also served approximately 2.9 million high-speed Internet customers and provided telephone service to approximately 1.3 million customers.

3.      During the Class Period, Defendants issued materially false and misleading statements regarding Charter's business and financial results.  As a result of the Defendants' false statements, Charter's stock traded at artificially inflated prices during the Class Period, reaching its Class Period high of $4.800 on July 19, 2007.

4.      As Charter's stock began to decrease in value, Charter assured its shareholders that it would have enough money to service its debt through at least September of 2010.

5.      In response to the decreasing values of Charter's stock and the rumor that Charter would not be able to service its debt, the Defendants began a public relations effort to assuage investors' concerns.

6.      On October 20, 2006, Charter's stock closed at $1.850.

7.      During the week of October 23 to October 27, 2006, UBS cable analyst Aryeh Bourkoff ("Bourkoff") issued an analyst's report raising his price target on Charter to $3.50 from $2.50, "as CHTR trends towards industry performance levels,"

2

in particular in EBITDA margins.  **In the report, Bourkoff stated that shares could reach $10 a share.  Under information and belief, Bourkoff was instructed by the Defendants to make these statements.**

8.     On October 27, 2006, Charter's stock closed at $2.290, up $.440 from October 20, 2006.

9.     On November 10, 2006, Bourkoff appeared in an interview on Bloomberg that contained the following dialogue:

> <Q>:  What if any media companies do you like right now?
>
> <A – Bourkoff>:  We like Newscorp, Comcast, and a small company called Charter as our top picks.
>
> <Q>:  Wait, you like Charter?
>
> <A – Bourkoff>:  (laughter)
>
> <Q>:  With all of their debt?
>
> <A – Bourkoff>:  Charter has debt.  They have a lot of debt and that actually helps you in an environment where multiples are going up.  I think Charter is on the mend.

10.     On November 14, 2006, Mike Farrel of Multichannel News published an article partially revealing Bourkoff's bias towards Charter:

> **In a research report, UBS Securities cable analyst Aryeh Bourkoff, the only analyst to have a "buy" rating on Charter stock and one if its biggest proponents, was encouraged by the results.**
> Bourkoff wrote that Charter's revenue and cash-flow growth beat his expectations and are 'a clear sign of recovery as the early stages of the VOIP rollout progress.'

11.     On December 5, 2006, Charter's stock closed at $3.090, up $1.240 from October 20, 2006.

12.     On December 6, 2006, Bourkoff and UBS hosted the UBS Global Media & Communications Conference.

13.     At the December 6, 2006, UBS Global Media & Communications Conference, Bourkoff said the following:

> ...[Charter]'s a company that we've covered for a long time on the debt and the equity side, and **we're a supporter of the company on all the securities across the capital structure, particularly the equity.** Last night we were talking with some investors who constantly quiz the company on their balance sheet, which **has been somewhat levered over the years.  And now that private equity is coming to the media industry and LBOs are everywhere, people characterize Charter's balance sheet as the dream balance sheet. Everyone is trying to get to where you are.  So congratulations on that and now the focus is on the operation.  Neil, over to you.**

14.     Also at the December 6, 2006, UBS Global Media & Communications Conference, the following dialogue took place:

> <Q>:  Now that you've been in the company for more than a year, can you comment on what other **– any reasons or anything that you see fundamentally or structurally that would cause you to believe that Charter cannot perform like the rest of the industry?**
>
> <A – Neil Smit>:  You know, I think that we had some obstacles to growth in the early stages and we, you know, we would talk about the capital structure, we would talk about the management team and things like that, but I think in terms of our growth in – based on what we've seen in the phone markets that are more mature, we see opportunity to drive margin, and **I haven't seen any large fundamental obstacles.**  I do think that you know, it's gradual, I mean as you know, you know, margin generally doesn't change dramatically one day to the next.  We work on both you know, the profitable revenue growth and so a lot of our time form operating and marketing perspective is balancing the ARPU and the volume to make sure that the customers we are bringing on convert to revenue and to EBITDA.

15.     On December 7, 2006, an Associated Press article was published touting Bourkoff's buy recommendation and reiterating the fact

that Bourkoff was being directed to make certain statements by the

Defendants:

> Shares of cable operator Charter Communications Inc. continued to climb Thursday, after a second analyst issued a bullish note on the company.

> The stock rose 8 cents, or 2.6 percent, to $3.17 in recent trading on the Nasdaq. That follows a sharp rise Wednesday, when the shares touched a new 52-week high before closing at $3.09. Those gains were precipitated by Pali Research initiating coverage with a "Buy" rating.

> Charter, founded by Microsoft co-founder Paul Allen, is the fourth-largest cable company in the U.S. Like the largest cable companies, Comcast Corp. and Time Warner Inc.'s cable unit, Charter has been expanding its ability to offer digital phone service, completing the so-called triple play package that also includes television and Internet.

> <u>Late Wednesday, UBS analyst Aryeh Bourkoff reiterated his "Buy" rating and increased his price target to $4.50 from $3.50.</u>

> **<u>Bourkoff said Charter CEO Neil Smit told him</u>** <u>the company's lower profit margins -- relative to peers -- are caused by costs associated with the introduction of the phone service.</u>

> <u>"Bolsters our view that margins can begin to narrow to (the sector average) over the next 18 months," Bourkoff wrote.</u>

> <u>Bourkoff expects that by the end of 2006, Charter will have more than doubled the number of homes capable of receiving phone service to 6.8 million from 3 million at the end of 2005. That would mean 24 percent of homes in its service area are able to get phone service.</u>

> **<u>Charter told Bourkoff that phone markets older than 12 months start to realize higher profit margins and lower rates of customer defection once the percentage of coverage exceeds 15 percent.</u>**

> <u>Bourkoff said the higher price target reflects his "confidence" the company will start to deliver operating performance in line with the industry average.</u>

16.     By December 13, 2006, Charter's shares increased in price from

$1.850 a share on October 20, 2006, to $3.360, a $1.510 increase.

17.    However by January 4, 2007, Charter's stock decreased in value to $3.090 from $3.360 on December 13, 2006.

18.    In response to the decrease in Charter's stock price, Bourkoff appeared in an interview with Bloomberg on January 5, 2007, once again promoting Charter's stock:

> <Q – Pimm Fox>: Let's talk about another company's balance sheet in Charter that's something that **a couple of analysts have questioned the power of the power of Charter's balance sheet...what's your outlook on Charter?**
>
> <A – Bourkoff>: **You know the power of Charter's balance sheet is a good way to say it because the Charter balance sheet is, is, is massive,** is about a leverage ratio to EBITDA of almost 9 times, the rest of the sector is close to between 5 and 7 times, so they are over-levered, no question about it.
>
> <Q – Pimm Fox>: Now does that mean, is that a big problem?  Paul Allen, the co-founder of Microsoft, has about 90% of the voting of the company.  Is that a big factor in the company's future?
>
> <A – Bourkoff>: It is certainly a big factor that has to be fixed. However, leverage can work in a company's favor as the company's fundamentals improve, and we are absolutely in that kind of environment for cable and for Charter.  The leverage ratios as I mentioned are on a depressed EBITDA margin and I think those will grow as they roll out voice.  **And, I think they will have the same kind of success as every other cable company like Comcast and Charter is our top pick and we think that the stock right now is at $3.00 and could reach $10.00 actually, not only because of fundamental growth, but because this is one of the few remaining companies that has a cost of debt above 10% and in this environment, if they can get to where they refinance that debt you could see a boom to the stock and to the financials.**

19.    Charter's stock rose to $3.520 on January 12, 2007, the week following Bourkoff's statements.  The stock increased in value the week following Bourkoff's statement by $.43.

20.    On February 9, 2007, Bourkoff was quoted in an article entitled "Charter Plans Debt Refinancing to Cut Interest Costs" as saying "[t]he deal may save at least $35 million in annual interest."  Further, the article stated the following:

> "[Charter] reported growth today which was strong financially," said Aryeh Bourkoff, an analyst at UBS AG.  Bourkoff, who is based in New York, has a "buy" rating on the stock and is the top rated bond analyst ranked by *Institutional Investor* magazine.  "For Charter this is a multistage process where they have to accelerate the financial growth of the company toward industry levels and take advantage of attractive debt markets," he said.

21.    On February 28, 2007, Charter's 4th Quarter Earning Call occurred and contained the following dialogue:

> <Q – Tuna Amobi>: ...And finally, it was refreshing to hear Paul Allen become more bullish on the industry.  Obviously, that is a testament to what you guys have done.  So the question there is, is there any indication of what, you know, when he might commit perhaps additional resources to growing this business or even all the expansion initiatives that you guys are doing. What is his overall approach to the subject?  Thank you very much.
>
> <A – Neil Smit>: ...Concerning Paul and his interest in the industry, he is very engaged in the business.  And I speak with Paul frequently, and it is a very constructive relationship, and I think, frankly, I would refer to you Paul concerning his future investments.  He has clearly made significant investment in the business, and I am just pleased that we, as a management team, can deliver the consistent operations and financial results that he is looking for.
>
> <Q – Aryeh Bourkoff>: ...And then secondly, just as a follow up to the last question, Paul Allen. I don't think has been in a press release quoted about the quarter in a long time.  Can you just confirm that's correct?  I would read into that as being a positive sign, but I was wondering if you would support that as well.  Thanks.
>
> <A – Neil Smit>: Yes, Aryeh, concerning Paul, I do not believe he has been quoted in a quarterly release in quite a while.  I look to the historians here and no one remembers a specific quarter that he did comment on the business.  But, as I said, he is very engaged in the business, and I'm happy to work with him and it has been a great relationship...

22.     On April 10, 2007, UBS announced that Bourkoff was being promoted as vice chairman of UBS Technology, Media & Telecom Investment Banking United effective May 1, 2007.

23.     With Bourkoff and Charter's buy recommendations still in effect, Charter's stock rose from $1.850 a share on October 20, 2006, to $4.0299 on May 31, 2007.   Under information and belief, Bourkoff made all of his statements at the direction of Charter and the Defendants.

24.     On June 29, 2007, Bourkoff's replacement at UBS, George Lambertson, also issued a buy recommendation with a Fair Value Range of $4.41 to $5.39.

25.     On July 13, 2007, Charter's stock closed at $4.460.

26.     At 4:30 pm on Friday, July 13, 2007, an article entitled "Charter Chairman Allen Predicts More Cable Merger," was published that stated the following:

> Paul Allen, the billionaire chairman of Charter Communications Inc., said he expects more mergers among U.S. cable television companies.
> **"There will be more consolidation in the next five years"** Allen said in an interview yesterday at the Allen & Co. media conference in Sun Valley, Idaho. **The trend in the business has been toward more consolidation because of factors of scale, especially with economies in programming and infrastructure.**
> "The pressure to acquire competitors has grown more intense as cable companies expand into broadband Internet and telephone services," Allen said in an interview.  A co-founder of Microsoft Corp., Allen is listed by Forbes magazine as the fifth-richest person in the world, with a $16 billion fortune.
> Allen's prediction was echoed by Richard Parsons, Time Warner Inc.'s chief executive officer, and investor Mario Gabelli, whose Gameco Investors own 19.3 million shares of Cablevision Systems Corp.

********

8

"There are undeniable economies of scale that you get with programming and other parts of your business," Allen said. "As long as those forces exists and you have a good financial environments, I believe transactions are certainly possible."

27.    From July 13, 2008, to July 19, 2008, Charter's stock rose from $4.460

to $4.800, a 7.6% increase.

28.    On August 2, 2007, in an earning call, Defendant Smit said:

**On the balance sheet side, I don't believe that selling assets is the solution to our balance sheet.** I think a lot of the work that we've done over the last few years has provided us the financial flexibility to sustain growth, and **so we're not forced to be in the market raising capital at this time. As I mentioned on the call, only 318 million of our maturities are due in the next two and a half years. We'll remain opportunistic with the balance sheet, and I think we demonstrated that we can effectively address issues as they arise.**

29.    Also, on August 2, 2007, Defendant Schmitz said the following:

Sure.  As [Smit] said earlier, **I don't think asset sales will – the strategy around asset sales has been or will be driven by liquidity or balance sheet needs. It will continue to be driven by what the operating benefits and strategic benefits there are to the company. I just want to remind you that we had $1.4 billion available under the revolver as of quarter end, and we have – we don't have any significant maturities until late 2010. So we've got three years of pretty good runway for our liquidity. We have about $350 million of debt maturing other than the converts until June of 2010, like you said, and then we've got the CCH II bonds maturing in September. So we've got – I think we've positioned ourselves well to not be forced to access the market when it's not a timely time in the market, and we'll continue to be opportunistic when the markets are strong, but at this point, we feel very good about our liquidity position, and don't feel the need to change any asset sales strategies.**

30.    From August 2, 2007, to August 14, 2007, Charter's stock fell from

$3.380 a share to $2.660 a share, down $2.14 from July 19, 2008.

31.     On August 14, 2007, Defendant Allen filed a Schedule 13D stating the

following:

**Item 4.**

**Purpose of Transaction.**

Item 4 is amended and restated in its entirety as follows:

Prior to the effectiveness of the Issuer's initial public offering, Mr.
Allen acquired control of CII and caused CII to form the Issuer for the
purpose of effecting the public offering. Subsequent to that time, the
Reporting Persons have directly or indirectly acquired beneficial
ownership of securities of the Issuer and its subsidiaries from time to
time for purposes of investment, and to provide financing to the
Issuer. The Reporting Persons will continue to review the
performance of their investments in the Issuer and its affiliates and to
consider or explore alternatives with respect thereto. **Mr. Allen,
through direct ownership of the Issuer's securities, through
membership interests of Charter Holdco owned by Vulcan or CCI,
or otherwise, may from time to time acquire or dispose of
beneficial ownership of additional securities of the Issuer or its
affiliates in open market transactions, private transactions or
transactions with the Issuer or it affiliates, pursue or propose
recapitalization or other possible restructuring transactions
designed to reduce the Issuer's leverage (which could include,
without limitation, exchanges designed to reduce the Issuer's
leverage including debt to equity exchanges), going private
transactions resulting in Mr. Allen acquiring beneficial
ownership of all or substantially all of the common stock of the
Issuer or other extraordinary corporate transactions, such as
mergers or reorganization or sales of material assets, with
regard to the Issuer or its affiliates. Any alternatives that the
Reporting Persons may pursue could depend upon a variety of
factors, including, without limitation, current and anticipated
future trading prices for the Issuer's securities, the financial
condition, results of operations and prospects of the Issuer, and
general economic, financial market and industry conditions.**

32.     On August 15, 2007, an article appeared entitled "Paul Allen Mulls

Buyout of Charter Communications." The Article stated the following:

**Billionaire Paul Allen may try to buy or recapitalize Charter
Communications Inc., the cable company he controls.**

10

Allen, 54, the co-founder of Microsoft Corp., is also considering steps to reduce St. Louis-based Charter's debt, as well as buying additional shares, **according to a regulatory filing today.**

The investor, Charter's chairman, controls the company through ownership of Class B shares that have more voting rights than the common stock.  It owns cable systems that would dovetail with Time Warner Inc.'s operations in Los Angels and New York. **Charter Chief Executive Officer Neil Smit said on Aug. 2 that the company is a buyer, not a seller.**

33.    Also, in the August 15, 2007, article entitled "Paul Allen Mulls Buyout

of Charter Communications," Charter spokeswoman, Anita Lamonst, was quoted as

stating:  **"We really can't speak for Mr. Allen about what his intentions of this**

**amendment are."**  This statement was made despite the fact that Mr. Allen was the

chairman of the board of directors and in complete control of Charter.

34.    From August 15, 2007, to September 5, 2007, Charter's stock rose

from $2.570 to $2.920, or $.35.  However, from September 5, 2007, to November 7,

2007, Charter's stock fell from $2.920 to $1.780.

35.    In a November 8, 2007, 3rd quarter earnings call, Defendant Smit

stated the following:

> ...As the market changes, we will adjust accordingly, but remain disciplined about marketing and operating approaches.  Moving on to the capital side of the business.  We continue to believe CapEX will be about $1.2 billion this year.  We recently made improvement to our maturity profile, with a successful completion of an exchange offer for nearly 90% of converts due in 2009 for new converts with a later maturity.  This result – reduced our cumulative maturities through 2009 from $1.1 billion to less than $400 million.  And we maintain opportunistic approach to further improve financial flexibility.

36.    Also in the November 8, 2007, 3rd quarter earnings call, the following

dialogue took place between Defendants Smit, Schmitz, and an unidentified caller:

> <A – Neil Smit>:  On the revolver, we have about $1.3 billion available and that's unrestricted.

11

<A – Eloise Schmitz>:  ...the end of the quarter.  We do have lumpy cash interest payments that do hit more heavily in the second and fourth quarters.

<Q – Unidentified Caller>:  Would you guys share your availability as of today?

<A – Eloise Schmitz>:  We haven't given down dates on revolver availability and I think the quarter end is what we are comfortable giving.

<Q – Unidentified Caller>:  Okay.  But the only major use of cash since 9/30/07 should have been the cash interest right?

<A - Eloise Schmitz>:  Yes.  I mean, cash is fungible, so to the extent that there were any other cash – they were no outside or extraordinary items.

<Q – Unidentified Caller>:  Thanks, Eloise.  Thanks so much.

37.    From November 7, 2007, to November 9, 2007, Charter's stock fell from $1.780 to $1.140, or $.64.

38.    In a UBS Global Media & Communications Teleconference on December 4, 2007, Defendant Smit said the following:

> ...On the balance sheet side, as many of you know here, we've worked hard over the last few years to really extend our maturities, improve our liquidity, and delever.  We've got less than $400 million cumulative maturities due before – or through 2009.  Our next wall is the CCHIIs in 2010 that are 2.2 billion, levered at a little less than 6 times.  86% of the debt is due in 2012 and beyond.  And we do have the revolver availability to allow 1.3 billion that is not restricted by covenants.

39.    Also in the UBS Global Media & Communications Teleconference on December 4, 2007, the following dialogue took place:

<Q – John Hodulik>:  We are going to go here and then back.

\<Q\>: ...to the $1.1 billion incremental facility.  And then secondly, as you approach 2009, what asset divestitures or markets might you consider selling to possibly meet those maturities?

\<A – Neil Smit\>:  So we'll take those in reverse.  I'll speak to the asset portfolio and then have Eloise talk to the facility.  The – on the asset side, selling assets doesn't solve our balance sheet.  Our primary focus in both '07 and going forward in '08 will be around clustering.  We see both capital benefits as well as operational benefits as we cluster tighter.  We announced in Q3 a tack-on acquisition with a municipality down in Covington, Georgia.  It was nice.  They didn't have a telephone product, they could plug right into our plant, we could operate them with our existing management structure.  They had lower penetration in similar products.  So it really showed great promise for us.  Some of the swaps in LA where we swapped Sacramento for Ventura and Palos Verde were nice.  They were a better cluster force than our LA cluster, the two that we swapped.  So, I think those are examples of how we are approaching the market and the asset portfolio.  But pure sale of assets doesn't necessarily address our balance sheet.  Eloise, on the second question?

\<A – Eloise Schmitz\>:  On the billion dollars, within our credit facilities, they provide for us to be able to raise an incremental billion dollars without having to go back to the lending group for permission to raise that.  So it facilitates an incremental facility within the credit facility.  The way the capital structure works is, throughout all the indentures, while they may have different provisions at different levels, that billion dollars could be raised and incurred throughout the capital structure, without regard to the leverage ratio.  That being said, I think you'd have to take it to the next step and say okay, what would you do with that billion dollars?  And making any restricted payments out of CCO, and up the capital structure, is contingent upon the leverage ratios in each of those different levels.  So, yes it could be incurred to support liquidity, but the usage would be limited to the leverage ratios throughout the capital structure...I did want to come back and add to the question of '09 maturities.  There is about $370 million worth of bond maturities through '09.  **I don't think that is an amount that is uncomfortable for us to manage, given the 1.3 billion in revolver availability and the incremental facility, and the leverage capacity over that time.  So I just wanted to come back that asset sales are not required to satisfy certainly our maturity profile.**

40.     From December 4, 2007, to December 7, 2007, Charter's stock rose

from $1.25 to $1.41.

41.    On February 27, 2008, Charter held an earning teleconference in which Defendant Smit stated the following:

> As of December 31, 2007, availability under our revolving credit facility totaled approximately $1 billion, none of which was limited by covenant restrictions. We expect that cash-on-hand, cash flows from operating activities, and the amounts available under our credit facilities will be adequate to meet our projected cash needs through the second or third quarter of 2009, and thereafter will not be sufficient to fund such needs. We will need to obtain additional sources of liquidity by early 2009.

This statement is inconsistent with the statements made just 6 months earlier in which the Defendants stated that they had sufficient cash to make it through September of 2010 and that Charter would not have to access the markets to make it through September 2010.

42.    On March 5, 2008, Charter filed an 8-K stating the following:

> Charter Communications, Inc. (the "Company") has been advised that its controlling shareholder, Paul G. Allen, has received informal inquiries from various parties regarding potential investments or transactions involving the Company.   With the consent of the Company's independent directors, the Company has recently provided a limited number of these parties certain material non-public information under nondisclosure agreements.

43.    On March 11, 2008, an article was published by Bloomberg entitled "Charter to Raise $775 Million, Gets Investor Interest."  The article stated that "the cable operator controlled by Paul Allen has been approached by potential investors in the company and plans to raise as much as $775 million in debt to help stave off bankruptcy."

44.    On April 18, 2008, Charter received notice from the Nasdaq Stock Market on April 14, 2008, that its Class A common stock had closed below $1.00 per

share for 30 consecutive business days, and the Company is therefore not in compliance with Marketplace Rule 4450(a)(5).

45.     On May 12, 2008, Defendant Smit stated the following in an earning teleconference:

> We remain disciplined in our capital spending and we expect to continue to prioritize investments in the products with the highest projected returns to enhance our services and maintain our competitive advantages. **During the first quarter, we completed a $1 billion financing transaction and we expect cash on hand, cash flows from operating activities, and the amounts available under our credit facilities will be adequate to meet our projected cash needs for 2009...**

46.     Also in the May 12, 2008, earnings teleconference, the following dialogue took place:

> <Q – David Hamburger>:  Hi, yes thank you, two questions if I may. When you filed your 8-K concurrent with the financing transactions in March, you had mentioned that some third party, interested parties had approached Paul Allen and the company with interest in potentially either investing or some sort of transaction associated with the company, I was wondering if you were prepared to provide any additional color around that.
>
> <A – Neil Smit>:  Yes, I think we said at the time on that disclosure that we would not be commenting further and I think we'll maintain that same position.

47.     On May 14, 2008, Charter announced that it had received notice from the Nasdaq Global Select Stock Market that it was compliant with the minimum price continued listing standard of the Nasdaq global Select Stock Market.  The Company regained compliance when the Company's Class A common stock closed at or above $1.00 for the 10 consecutive business days ending May 12, 2008.

48.     On June 30, 2008, Charter announced that approximately $338 million aggregate principal amount of 10.25% Senior Notes Due 2010 had been validly tendered in exchange for additional 10.25% Senior Notes due 2013.

49.     On September 4, 2008, Charter filed an 8-K stating the following:

> As of August 29, 2008, Charter Communications, Inc. (the "Company") entered into exchange agreements with each of the four holders (the "Holders") of the Company's Series A Convertible Redeemable Preferred Stock ("Preferred Stock").  Pursuant to the exchange agreements, the Holders exchanged 36,713 shares of Preferred Stock having a liquidation preference of $4,840,985 for 4,699,986 shares of the Company's Class A Common Stock ("Common Stock") based on the closing price of the Common Stock on August 25, 2008. The shares of Preferred Stock were cancelled by the Company and no shares of Preferred Stock remain outstanding.

50.     On September 10, 2008, the following dialogue took place in a Charter investors conference call:

> <Q - Unidentified Audience Member>:  And maybe just one question for Eloise on the balance sheet.  As we think about the CCH2 maturity in 2010, is it fair to assume that the past will sort of be prolonged in terms of how you address that maturity?  If you could talk a little bit about some of the initiatives that you've taken this year and what your objectives are in terms of meeting that maturity?

> <A – Eloise Schmitz>:  Sure.  Our strategies around the balance sheet have been fairly consistent for the past three years. **And its been around making sure we have adequate liquidity to support the business, extend the maturities, and trying to be fairly proactive about that as opposed to waiting until the maturities lie on top of us, and delever where we can.** And over the past three years, we've done a significant amount in transactions that have really hit on all three of those strategies in different ways. And some transactions will hit more on liquidity than maturity extension or some deleveraging - more deleveraging than others.

> This year, we went into the market in the first quarter and issued about $1 billion of incremental liquidity. **So now we're sitting with about $1.4 billion of liquidity to support our business and operations, which we feel very good about and feel very fortunate that we did act when the market was open.** Although, it

was a different kind of open than it was certainly in 2007. In 2007, we refinanced all of our bank agreements and lowered the interest to LIBOR plus 2.00%, and this year, we were able to add the incremental facility, but it was at LIBOR plus 5.0%. So again, different markets present different opportunities in different ways, but I think we've demonstrated that we will make sure that we're acting ahead of our needs. We certainly didn't need to go to the market then, but we didn't want to hope for a better market or wait until we had to go and the market was closed.

As it relates the CCH2 piece, we did do a transaction that closed just in July where we extended about $340 million of the then about $2.2 billion worth of debt. So now we're down to about $1.9 billion of the CCH2 2010 maturity. And that was, again, a fairly opportunistic transaction. It was one where we were not intending to bring in a significant portion of the 2010s, but rather extend a portion of those that would naturally move to the 2013 maturity without, frankly, without much premium.

Those do mature two years out from now. **<u>I, again, feel fortunate that I don't have to do anything on those maturities.</u>** But we will continue to watch how the market looks, what the options are, and balance that with trying to be responsible for the overall balance sheet and maturities profile. It's certainly something that we're always watching, but I can't tell you today what those next transaction or transactions may be.

51.     At the close of business on September 10, 2008, Charter's stock had

risen from $1.03 on September 9, 2008, to $1.04 on September 10, 2008.

52.     On September 25, 2008, in a teleconference at the Duestche Bank

Leveraged Finance Conference, Defendant Schmitz stated:

So, now we've gotten the maturity profile pushed off significantly. The overall capital structure and covenant levels of the company are much more aligned with our business that allows us to make sure that the strategies for the business all that Neil just outlined are geared towards long term growth.   From a capital structure perspective really quickly, liquidity seems to be top of mind, [inaudible] of the chart.  We raised $1 billion liquidity back in March of '08 as Neil talked about.  We had $1.4 billion of liquidity cash and revolver availability at the end of the second quarter.   We have liquidity as our public statements have said, we have liquidity to service – to allow us to fund our business and service our debt through 2009.  While we cannot

make that statement in 2010, it's predominantly because of our CCH II maturities of $1.9 billion in September of 2010.

We have continued a very consistent approach to the balance sheet, consistent maturities where we can delever where that is available. So, you can see we've done, continued to work on both maturities and enhancing the liquidity position, so we get an exchange offer on CCHII in the second quarter and we also enter the liquidity transaction we've talked about.   Our next major maturity again is CCHII which is levered at 5.5 times, I realize that's in a senior part of our capital structure, but even at 5.5 times I think that all well covered from evaluation perspective.

53.     Also, in the September 25, 2008, teleconference the following dialogue took place:

<Q>: [Inaudible}.

<A – Eloise Schmitz>:  In terms of overall liquidity?

<Q>: Yes.

<A – Eloise Schmitz>:  There is a couple of pieces – there is the side relating to our operations, and our EBITDA less CapEx grew at about 8% for the quarter, and to keep that in perspective, earning was to only grew at about 1.5%.  So, we are making progress towards the free cash flow side of the business.  We continue to make sure we're driving that, and driving all our decisions as efficiently as we can.

We've also – as we talked about, the next significant maturity is the CCHII, **so we'll continue to look at our options, that's about a billion nine of maturities that mature two years out.  So it certainly isn't a year-end '09 issue but it is an issue that's still – we will keep our eye on, and we'll try to be optimistic about it. We do have, as I said in my comments, we have liquidity through '09 already, the 1.4 billion provides liquidity through '09, and does not, through 2010, predominantly because of that maturity. So it's not like the world comes to an end on January 1, 2010.**  So we'll continue to be opportunistic.  The best I can tell you now, is we are going to watch the market.  We'll take advantage of opportunities as they come that fit best with what we need to do, and we'll continue to make sure we're monitoring and managing our business as best as we can to support our long-term goal, at the same time be prudent about all of the investments we make.

18

*******

<Q>: I guess maybe the one wild card is how Paul Allen fits within the grand scheme of things of how you think about the business and the capital together?  And he has been relatively quiet for a while; I don't know if you can sort of share what his impact has been in any of the sort of strategic decisions that you've made or if he's talked to you about how he views the capital structure long term.

<A – Neil Smit>:  Paul is very engaged in the business.  I speak with Paul every week; he understands the business and the capital structure extremely well.  He is very constructive in his thinking both in terms of how to grow the business as well as different strategic alternatives for the business.  We have strategic discussion at every board meeting where we start out with the market and what's going on in the market and yields and the curves, and then we review kind of – let's take a look at liquidity and free cash flow and things like that, and have a very open conversation – Paul is very engaged, I describe him, I think very bullish on the sector and the industry.  And, yes, I can't – I couldn't ask for a better, more constructive kind of thought partner in the business.

54.    On November 6, 2008, in a 3rd quarter earning teleconference;

Defendant Schmitz said the following:

Turning to the balance sheet, as of September 30th, cash on hand and revolver availability totaled approximately $1.3 billion, none of which was limited by covenant restrictions.  In response to recent financial markets, we have borrowed amounts under our Charter operating revolving credit facility in excess of our immediate needs.  We may from time to time increase or decrease the borrowings under our revolver as we balance market risk with our liquidity needs and the leverage ratios of our subsidiaries.  As Neil said, we're focused on leveraging investments in our infrastructure and promoting the value of the bundle to grow, the overall business and maximize balance sheet opportunities.  I'll now turn the call over to Mike Lovett for a discussion of our operations.  Mike?

55.    Also in the November 6, 2008, teleconference, the following dialogue

took place:

<Q – Michael Pace>:  Great.  Thanks.  And then just – I hate asking housecleaning questions, but Eloise, what was the revolver balance at

the end of September?  I'm sure I could figure it out from the Q but it's been a busy morning, sorry.

<A – Eloise Schmitz>:  That's okay.  The revolver balance at the end of September was $565 million.  We have drawn down additional funds since the end of quarter as we discussed in our comments.  But we may continue to review our revolver balances going forward.

********

<Q – Jason Bazinet>:  Just one quick question for Neil.  I think in the past you've expressed some reluctance to sort of consider asset sales, to the extent that maturities come due and the credit markets remain challenged.  Has there been any change in your thinking on that front or is that still the same?

<A – Neil Smit>:  Hi Jason.  No, I think our approach to assets has remained the same in that we, where we see opportunities for clustering which will give us both operating and capital efficiencies we'll take those.  I still don't believer that fundamentally that asset sales are a solution to any balance sheet issues.  So our strategy remains consistent in that regard.

********

<Q – Richard Greenfield>:  Hi.  A couple of questions.  One, the last couple of times you reported, your press release has focused on a comment about liquidity in 2010 and the gap that relates to your maturity in that year.  **I'm just wondering given the lack for that comment in this quarter's press release whether that has changed given what you've done on the balance sheet side?**  And if you could just update us there broadly that would be great.  And then, two, just on video ARPU, up 7% that's the strongest you've seen in a while.  Just wondering given the overall economy how do we think about the rate increases you pushed through and the overall increase in the mix of video subscribers?  How should we think about video ARPU growth going forward?  Thanks.

<A – Neil Smit>:  Hi Rich.  I'll cover the front end of that and then turn it over to Mike for the ARPU section.  I think we're all facing challenging credit market conditions.  And we continue to focus on the opportunities to gain efficiencies in our operating platform and grow the overall business so that we can help maximize the balance sheet opportunities.

**We have, as we reported, $1.35 billion in liquidity as of September 30. And the next major maturity is $1.9 billion of CCH2 bonds in September 2010.** However, we have to maintain the ability to move funds within the structure to pay the interim maturities. I think we're really focused on operational execution and we'll continue to evaluate the options to improve liquidity and reduce leverage. We've shown that as those opportunities arrive we are able to respond in a timely manner and we'll just continue to be opportunistic and see how things evolve. Mike, the ARPU question....Rich, I'll have Eloise out in a second. Please be patient. She been a little under the weather and losing her voice.

<A – Eloise Schmitz>: Hi, Rich, the liquidity statement is still in the Q. And in the Q we do say that we've got adequate liquidity through 2009 but no in 2010 primarily as a result of the $1.9 billion of CCH2 bonds maturing in 2010 as Neil said. But as it relates to debt service, the use of that liquidity is subject to our ability to make distributions within the corporate structure, which is why it continues to be an expanded disclosure in the Q.

## THE FRAUD IS REVEALED

56.     On December 12, 2008, Charter announced it asked financial adviser Lazard Ltd. to talk with the company's bondholders about financial alternatives to improve its balance sheet. Charter also revealed that cash and cash equivalents were more than $900 million as of December 10, 2008, which conflicts with Charter's statements in November that it had $1.35 billion.

57.     On February 12, 2009, Charter announced that it would file for Chapter 11 bankruptcy before April 1, 2009.

58.     On March 11, 2009, UBS announced that Bourkoff would be joint global head of media and communications investment banking, taking over for Jeff Sine. **On this date, it was revealed that Bourkoff had worked on a variety of big media deals including the restructuring of Charter Communications. In other**

**words, Bourkoff had been working to obtain Charter's business while giving it a buy recommendation with a value of $10.**

59.    On March 12, 2009, the *Wall Street Journal* published an article entitled, "Meet UBS's New Global co-Head of Media Investments."  This article made it clear that Bourkoff's quick ascent to this position was unusual:

> USB media banker Aryeh Bourkoff has landed another deal—taking over much of his boss's portfolio.
>
> ********
>
> **Bourkoff's appointment marks an unusually steep ascent for a former analyst**.  Before jumping to the investment-banking arm of UBS in 2007, Bourkoff spent seven years on the bank's research team, with stents at other shops before that.  Bourkoff had developed a strong reputation—including a "Best on the Street" tap from the *Wall Street Journal* in 2006—**and people close to him say he has a knack for building relationships.**
>
> ********
>
> **In recent months, Bourkoff's team has been involved in Liberty Media Corp.'s investment in Sirius XM Radio Inc., Charter Communications restructuring** and Macrovision Solutions Corp.'s sale of the TV Guide Network to Lions Gate Entertainment Corp.

60.    Bourkoff's $10 buy recommendation was not withdrawn until sometime in January of 2009.

61.    In an article published April 3, 2009 by Richard Morgan, it was revealed to the public that Bourkoff became Charter's primary banker in 2007, when Bourkoff was promoted, just after Bourkoff gave his $10 buy recommendation for Charter's stock:

> **And UBS joint global head of media and communications of investment banking Aryeh Bourkoff, who began covering Charter as an analyst before Allen bought it, has been its primary banker since switching UBS departments in 2007.**

62.    On March 27, 2009, Charter filed for Chapter 11 bankruptcy protection despite its earlier statements that it had sufficient cash to make it through September of 2010.

63.    The pre-packaged plan required no debtor-in-possession bankruptcy financing, but the nation's fourth-largest cable operator by number of subscribers would receive $3 billion through refinancing and new equity investment.

64.    On March 27, 2009, Charter's stock traded at $.03 down $4.73 from the Class Period high of $4.800 on July 19, 2007.

65.    The true facts, which were known by the Defendants but concealed from the investing public during the Class Period were as follows:

      a.   Charter could control what Defendant Allen did and what he said as he was in control of Charter.  Charter could comment on the purpose of Allen's press releases as Defendant Allen was the chairman of the board of directors of Charter.

      b.   Charter's stock was not worth $10 and there was no way that it ever could be with its debt at the time. Bourkoff was directed to make that statement and other statements related to Charter by the Defendants as it was later revealed that, after making this recommendation Bourkoff had become Charter's primary banker.

      c.   Allen had no intent to buy or recapitalize Charter.

      d.   Charter did not have enough sufficient cash flow to service its debt through September of 2010.

     e.   The Company had severe liquidity issues, which could have been alleviated by the sale of certain assets.

     f.   The Company's cash flow was not significant but in fact was plummeting due to the economic downturn.

     g.   The Company did need to access the markets in order to obtain sufficient cash to make it through September of 2010 despite the Defendants' statement to the contrary in August of 2007.

66.     Significantly, Charter's bankruptcy filing was **voluntary**, i.e. Charter chose to file bankruptcy.

67.     According to Charter's bankruptcy plan, Charter had "settled" with Defendant Allen for about $99 million at or around the time that the Defendants stated that they had enough cash to make it through September of 2010.  This "settlement" was not fully disclosed until Charter filed bankruptcy.

68.     On May 7, 2009, Charter issued a press release stating that Charter's revenue had risen by 6.5% and that its cash flow was up 13.2% for the first quarter. These financial results were slightly ahead of Charter's peers as Time Warner Cable reported 4.9% revenue and 7.5% cash flow growth and Comcast tallied 5.4% revenue and 8% cash flow growth.

69.     As a result of Defendants' false statements, Charter's stock prices traded at inflated levels throughout the Class Period.

### JURISDICTION AND VENUE

70.     Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

71.     Venue is proper in this District pursuant to §27 of the 1934 Act as the Defendants transact business within this District.  Many of the false and misleading statements were made in or issued to this District.

72.     Charter's principal executive offices are located at 12405 Powerscourt Drive, Suite 100, St. Louis, MO 63131.

### PARTIES

73.     Plaintiff Herb Lair, at all times relevant owned Charter stock.  Plaintiff has been injured as a result of the purchase of said stock.  Plaintiff is a citizen of the state of Arkansas.

74.     Defendant Schmitz ("Schmitz") was, at relevant times, Chief Financial Officer ("CFO) of Charter or was an employee of Charter.

75.     Defendant Smit ("Smit") was, at relevant times, Chief Executive Officer ("CEO") of Charter.

76.     Defendant Allen ("Allen") was, at relevant times, chairman of the board of Charter.

77.     Defendants Schmitz, Smit, and Allen (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Charter's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material

non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## FRADULENT SCHEME AND COURSE OF BUSINESS

78.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Charter. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Charter was a success, as it: (i) deceived the investing public regarding Charter's liquidity, prospects and business; (ii) artificially inflated the price of Charter's stock; and (iii) caused the plaintiffs and other members of the Class to purchase Charter's stock at inflated prices.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

79.     In an effort to forestall this inevitable plummet into Charter's bankruptcy, Charter's Allen informed the news media that the possibility of a merger existed.  Moreover, Charter's CEO informed the investing public that if a merger did occur, Charter would be the buyer and not the seller.  Also, Charter told the investing public it could not speak for Mr. Allen's intentions, when Defendant Allen was the chairman of the board of Charter.  Additionally, Defendant Allen had no intention of recapitalizing or taking Charter private; his only motive was to artificially inflate the securities of Charter.

80.    The Defendants issued statements in August of 2007 indicating Charter would not have to access the markets in order to maintain enough liquidity to service its debt until September of 2010, yet less than 6 months later, Charter decided to access the markets for more cash.  Further, this cash did not provide Charter with enough liquidity to service its debt until September of 2010 as Charter filed for bankruptcy in March of 2009.

81.    The Defendants issued statements through Bourkoff that Charter's stock should be valued at $10.   These statements and Bourkoff's buy rating remained in effect until January of 2009.  Yet, it was not revealed to the public that Bourkoff had become Charter's primary banker less than a year after making the statements about Charter's stock until April of 2009.

82.    Repeatedly during the class period, Defendants Smit and Schmitz stated to the investing public that Charter had enough cash to make it through to September of 2010.

83.    Allen, Smit, and Schmitz's statements caused Charter's stock to reach a class period high of $4.8000 on July 19, 2007, and also caused investors to keep their stock as Charter had enough cash to make it for another year and a half before Charter filed for bankruptcy.

84.    As a result of the Defendants' false statements, Charter's stock traded at inflated levels during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

85.    By misrepresenting Charter's financial outlook, the Defendants presented a misleading picture of Charter's business and prospects.  Thus, instead of

truthfully disclosing during the Class Period that Charter's business was not as healthy as represented, Defendants falsely reported Charter's financial outlook and its actual business prospects going forward.

86.     These claims of profitability and of ability to service debt caused the price of Charter's stock throughout the Class Period to trade at inflated levels and continued to trade at inflated levels until the truth was revealed to the market when Charter revealed that it would likely file bankruptcy.

87.     Defendants' false and misleading statements had the intended effect and caused Charter's stock to trade at artificially inflated levels throughout the Class Period, reaching its all time high of $4.800 on July 17, 2007.

88.     The truth about Charter's business operations, finances, business metrics, and future business and financial prospects began to enter the market with a series of partial disclosures and revelations beginning in 2007 which were accompanied by denials and continuing misrepresentations by Defendants.  As a result, the artificial inflation in Charter's stock price did not come out of the stock all at once; rather the artificial price inflation came out over time, in bits, pieces, and spurts as the stock continued to trade at artificially inflated, albeit lower, prices through February 12, 2009.

89.     As a direct result of Defendants' admissions and the public revelations regarding the truth about Charter's overstatement of its financial outlook and its actual business prospects going forward, Charter's stock plummeted.

90.   This drop removed the inflation from Charter's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

## CLASS ALLEGATIONS

91.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Charter stock during the Class Period (the "Class"). Excluded from the Class are defendants.

92.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Charter has issued hundreds of millions of shares of stock, owned by hundreds if not thousands of persons.

93.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law or fact common to the members of the Class which predominate over questions that may affect individual Class members include: whether the 1934 Act was violated by defendants; whether defendants omitted and/or misrepresented material facts; whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; whether defendants knew or deliberately disregarded that their statements were false and misleading; whether the price of Charter stock was artificially inflated; and the

extent of damage sustained by Class members and the appropriate measure of damages.

94.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from the defendants' wrongful conduct.

95.     Plaintiff will adequately protect the interests of the Class and has retained counsel that is experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

96.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I – VIOLATION OF §10(b) of the 1934 Act and Rule 10b-5 Against all Defendants

97.     Plaintiff incorporates the previous paragraphs as if stated word for word herein.

98.     During the Class Period, Defendants disseminated or approved false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

99.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they; employed devices, scheme and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaged in acts, practices and a course of business that operated as a

fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Charter's stock during the Class Period.

100.   Plaintiff and Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Charter's stock. Plaintiff and the Class would not have purchased Charter's stock at they prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

### COUNT II – Violation of §20(a) of the 1934 Act Against All Defendants

101.   Plaintiff incorporates the previous paragraphs as if stated word for word herein

102.   The Individual Defendants acted as controlling persons of Charter within the meaning of §20(a) of the 1934 Act.  By reason of their positions with Charter, and their ownership of the Charter's stock, the Individual Defendants had the power and authority to cause Charter to engage in the wrongful conduct complained of herein.  Charter controlled the Individual Defendants and all of its employees.  By reason of such conduct, the Defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment as follows:

a)  Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

b)  Awarding Plaintiff and the members of the Class damages, including interest;

c)  Awarding Plaintiff reasonable costs and attorneys' fees; and

31

d)  Awarding such equitable/injunctive or other relief as the Court may deem

just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: 6/1/09

By: Richard W.

Richard E. Walden
Ark. Bar No. 2006069
WALDEN LAW FIRM, PLLC
ARK. BAR NO. 2006069
8201 Cantrell Rd., Suite 315
Little Rock, AR 72227
Telephone: 501.748-4835

32

## PLAINTIFF'S CERTIFICATION

Herb Lair ("Plaintiff") declares under penalty of perjury, as to claims asserted under the federal securities laws, that:

1.      Plaintiff has viewed the complaint and authorized the commencement of an action on Plaintiff's behalf.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff's transactions in Charter Communications Securities during the Class Period on behalf of himself and/or his spouse, specified in the Complaint are as follows:

| Date | Number of Shares Purchased | Number of Shares Sold | Price |
|------|---------------------------|----------------------|-------|
| 2/28/06 | 1000 | | 1.230 |
| 3/10/06 | 3000 | | 1.000 |
| 3/10/06 | 3000 | | 1.000 |
| 3/10/06 | 1000 | | 1.000 |
| 3/21/06 | 2000 | | 1.030 |
| 4/26/06 | 10000 | | 1.160 |
| 5/31/06 | | 3000 | 1.06383 |
| 8/3/06 | 3000 | | 1.280 |
| 8/3/06 | 3000 | | 1.280 |
| 8/8/06 | 8000 | | 1.230 |
| 8/8/06 | 2000 | | 1.220 |
| 8/11/06 | 1000 | | 1.330 |
| 8/30/06 | | 1000 | 1.360 |
| 8/31/06 | 2000 | | 1.380 |
| Unknown | 4000 | | Unknown |
| 10/18/06 | 3000 | | 1.790 |
| 11/1/06 | | 1000 | 2.500 |
| 11/3/06 | 2000 | | 3.010 |

| | | | |
|---|---|---|---|
| 11/3/06 | 2000 | | 2.450 |
| 11/3/06 | 500 | | 2.450 |
| 1/18/07 | 1000 | | 3.350 |
| 1/31/07 | 1000 | | 3.470 |
| 2/23/07 | 1500 | | 3.190 |
| 2/27/07 | 1000 | | 2.990 |
| 4/3/07 | 240 | | 2.690 |
| 4/12/07 | 4000 | | 3.097 |
| 4/12/07 | 2000 | | 3.097 |
| 5/30/07 | 760 | | 4.138 |
| 5/30/07 | 500 | | 4.1385 |
| 5/31/07 | 2500 | | 3.986 |
| 8/16/07 | | 1000 | 2.392 |
| 9/4/07 | 2000 | | 2.890 |
| 9/26/07 | | 500 | 2.542 |
| 9/28/07 | | 2000 | 2.591 |
| 10/5/07 | | 1500 | 2.860 |
| 10/5/07 | 1000 | | 2.870 |
| 10/15/07 | | 500 | 2.700 |
| 10/18/07 | | 500 | 2.642 |
| 10/22/07 | 375 | | 2.698 |
| 10/25/07 | 750 | | 2.177 |
| 10/29/07 | | 1000 | 2.093 |
| 10/30/07 | | 500 | 2.042 |
| 11/1/07 | | 3000 | 2.022 |
| 6/6/08 | 2000 | | 1.450 |
| 9/9/08 | 5000 | | 1.040 |
| 10/8/08 | 5000 | | .7261 |
| 10/14/08 | 6000 | | .5461 |
| 12/29/08 | 30500 | | .08992 |
| 12/29/08 | 38625 | | .090 |
| 1/7/09 | 50000 | | .110 |
| 1/7/09 | 9250 | | .110 |

5.     During the three years prior to the date of this Certificate, Plaintiff

has not sought to serve or served as a representative party for a class in an action

filed under the federal securities lass.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond the Plaintiff's pro rata share of any recovery, expect such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 29th day of May, 2009.

Herb Lair